OPINION
Appellants Linda and Dennis Keeton appeal from the June 29, 1998, judgment entry of the Morrow County Court of Common Pleas.
 STATEMENT OF THE FACTS AND CASE
On or about August 21, 1995, Appellants Linda and Dennis Keeton entered into an agreement with Appellee Hinkle Builders (hereinafter referred to as appellee) for the construction of a house on appellants' land at a cost of $121,800. Appellee procured the design engineer who drew the construction blueprints. The construction was financed by a loan through State Savings Bank. Pursuant to the terms of the agreement, all work on the house was to be "substantially completed" by appellee within ninety working days. The completion date of the house was a matter of great concern to appellants because they had to reside in a replacement residence by mid-April 1996 in order to avoid capital gains taxes. For this reason, appellants informed appellee of their potential capital gains tax problem and of their need to be in their home by April. Appellee does not dispute that he was told of appellants' potential tax problem and their need for a mid-April completion date. Before construction on the house commenced, an unreleased oil pipeline easement was discovered by State Savings Bank's title examiner that had to be released. Construction of appellants' house began on November 22, 1995, after the easement was released and the title matter was resolved to State Savings' satisfaction. Despite the lengthy delay caused by the easement, appellee did not obtain an extension of the ninety-day period contained in the parties' agreement since he believed he could complete the project on time "[i]f everything went right." Tr. at 257. Appellee, however, conceded that "it was a tight schedule." Id. at 256. Appellee, on November 22, 1995, started digging the foundation for appellants' house. During the first week of December, the footers were poured. Thereafter, construction proceeded slowly because of the adverse weather conditions. According to appellee, due to rain and snow, the hole for the foundation kept filling with water making it impossible for him to lay block for the foundation. Finally, in March 1996, the foundation for appellants' home was completed. Although the house was under roof by late April 1996, appellants did not move into the house until July 23, 1996, causing them to incur increased income taxes of $5,491.05. On this date, the air conditioning and heating were not hooked up and some of the carpeting and molding still had to be installed. However, due to financial pressures, appellants were forced to move into the house despite its unfinished condition. In late August 1996, after appellants sent appellee a letter stating that no additional monies would be paid to appellee until appellants had been made whole on the contract, appellee ceased work. Thereafter, on October 3, 1996, Baldauf Lumber Do-It Center, which had supplied materials to appellants' home, filed a mechanic's lien against appellants' property in the amount of $10,384.82. On May 20, 1997, appellants filed a complaint against Appellee State Savings Bank, which held certain undisbursed funds from appellants' construction loan, and Straight and Lamp Group, Inc. dba Baldauf Lumber Do-It Center. Appellants, in their complaint, alleged that appellee breached its contract with appellants and breached both express and implied warranties and violated the Ohio Consumer Sales Practices Act, O.R.C. 1345.01 et seq. Appellants further alleged that State Savings refused to release remaining loan proceeds, which totaled $23,000, in the absence of appellee's approval. Both appellee and State Savings Bank filed answers on June 19, 1997. Appellee, on such date, also filed a "counter-complaint" against appellants seeking payment of the balance of the contract price and for some "extras" it allegedly incurred during construction. Appellants filed an answer to the same on June 27, 1997, with leave of court. Straight Lamp Group, Inc., dba Baldauf Lumber Do-It Center on July 31, 1997, filed an answer and counterclaim against appellants and a cross claim against appellee and State Savings Bank. State Savings Bank filed an answer to such cross-claims on August 13, 1997. Two weeks thereafter, appellants filed an answer to Straight Lamp Group, Inc.'s counterclaim. Pursuant to an order filed on December 9, 1997, the trial court scheduled the matter for a bench trial and ordered that "the claims of Baldauf Lumber Do-It Center and the potential claims of State Savings Bank are hereby bifurcated with both parties reserving its claims until such time as plaintiffs' and defendants' claims against one another are adjudicated." A bench trial was held on March 5 and 6, 1998. At trial, appellants' expert, Dr. Vedaie, testified. Dr. Vedaie has a Bachelor's Degree in Commercial Engineering, a Master's Degree in Structure and a PhD in Engineering. Dr. Vedaie testified that the workmanship on appellants' house was poor. Dr. Vedaie further testified that "my main concern when I saw the pictures and that footer went through a freeze and thaw and makes the concrete weaker, it makes the concrete crack, it makes the concrete to have a macho crack, inside extensive crack. So that was my main concern of looking at the structure." Id. at 120. According to Dr. Vedaie, the footer went through a freeze and thaw cycle which would, in his opinion, destroy the usefulness of the concrete if it was not of a proper type. Dr. Vedaie, whose report was admitted into evidence, further testified as to numerous other problems with the house. Dr. Vedaie, for example, testified that the support beam in appellants' house was settling and that if too many people stood in the hallway of appellants' house, the house could collapse. In addition to Dr. Vedaie, Don Davis, a real estate appraiser and business consultant, also testified on behalf of appellants. Davis, relying on the report prepared by Dr. Vedaie and his own experience as a real estate appraiser and a business building consultant, testified that the workmanship on appellants' home was "average, overall." Id. at 174. Davis, whose expert report was admitted into evidence, estimated the total to repair the defects to appellants' home at $31,676.07. In turn, Ronald Kyser, appellee's expert, who holds a Bachelor's Degree in Construction, testified that the construction was "average" quality for a moderate or low cost house and that appellants received good value for their money. Id. at 94. Kyser, whose report was admitted into evidence, further testified that the problems with appellants' house appeared to be minor with the exception of the remedial work on the basement floor and wall and some cracks in the exterior stucco. After the conclusion of the trial, appellants and appellees filed post-trial memorandums. Pursuant to a judgment entry filed on April 13, 1998, the trial court found that appellee breached his implied duty to perform in a workmanlike manner. The trial court, in addition to awarding appellants $11,465 in damages, also granted judgment to appellee for the approximately $23,000 balance due under the parties' contract and for $1,679.35 on its counterclaim for extras. The trial court also ordered that appellee pay the $10,384.82 Balduaf's mechanic's lien. The trial court held that appellants "may offset judgment against the balance of construction loan proceeds after payment of the Baldauf mechanic's lien has been paid off, . . . ". However, the trial court denied appellants' claim for damages caused by appellee's delay and declined to find that appellee violated the Ohio Consumer Sales Practices Act. A Final Judgment Entry was filed on June 29, 1998. It is from the June 29, 1998, Judgment Entry that appellants prosecute their appeal, raising the following assignments of error:
ASSIGNMENT OF ERROR I
 THE COURT'S FAILURE TO FIND A VIOLATION OF THE CONSUMER SALES PRACTICE (SIC) ACT WAS AN ABUSE OF DISCRETION AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
ASSIGNMENT OF ERROR II
 THE COURT'S FAILURE TO AWARD DAMAGES FOR THE CONTRACTOR'S FAILURE TO SUBSTANTIALLY COMPLETE CONSTRUCTION WITHIN "90 WORKING DAYS" WAS AN ABUSE OF DISCRETION AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
ASSIGNMENT OF ERROR III
 THE COURT'S CALCULATION OF PLAINTIFF'S (SIC) DAMAGES FOR DEFENDANT'S BREACH OF ITS IMPLIED DUTY TO PERFORM WORK IN A WORKMANLIKE MANNER WAS AN ABUSE OF DISCRETION AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
ASSIGNMENT OF ERROR IV
 THE COURT'S FAILURE TO AWARD DAMAGES FOR THE UNDERPINNING OF THE FOOTER WAS AN ABUSE OF DISCRETION AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
ASSIGNMENT OF ERROR V
 THE COURT'S AWARD OF DAMAGES TO APPELLEE ON HIS COUNTERCLAIM FOR EXTRAS WAS AN ABUSE OF DISCRETION AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
ASSIGNMENT OF ERROR VI
 THE COURT'S DIRECTION TO PAY THE MECHANICS' LIEN TO BALDAUF WITHOUT GIVING THE OTHER PARTIES AN OPPORTUNITY TO BE HEARD AS TO THE PROPRIETY OF THE PAYMENT WAS CONTRARY TO THE PARTIES' STIPULATION BIFURCATING BALDAUF'S CLAIMS AND THEREFORE WAS AN ABUSE OF DISCRETION AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 I
Appellants, in their First Assignment of Error, maintain that the trial court's failure to find a violation of the Consumer Sales Practices Act was against the manifest weight of the evidence. We disagree. Appellants specifically contend that the trial court erred in failing to find such a violation since appellee admitted, at trial, to filing false affidavits to obtain construction draws, and appellee maintained "a pattern of inefficiency, incompetency, delay, false and misleading statements and/or omissions of material fact during construction." With respect to the latter, appellants point out that appellee failed to inform appellants that he had three other houses under construction at the same time as appellants' house and failed to inform appellants that he did not believe he could complete their house, on time, although he told State Savings Bank he could. We will review this assignment of error under a manifest weight standard. Pursuant to this standard, we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA-5758, unreported. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction (1978), 54 Ohio St.2d 279. The Ohio Consumer Sales Practices Act, which is codified at R.C. 1345.01 et seq., is applicable to residential construction contracts. Keiber v. Spicer Constr. Co. (1993), 85 Ohio App.3d 391. A homebuilder who commits a deceptive or unconscionable act prohibited by R.C. 1345.02 or R.C. 1345.03 can be, pursuant to R.C. 1345.09, ordered to pay treble damages and attorney's fees. Pursuant to R.C. 1345.02(A), "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." R.C. 1345.02(B) provides, in part, that the act or practice of a supplier, in representing any of the following, is deceptive:
 (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not;
* * *
 (5) That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not, except that the act of a supplier in furnishing similar merchandise of equal or greater value as a good faith substitute does not violate this section;
* * *
 (9) That the supplier has a sponsorship, approval, or affiliation that he does not have;
Under R.C. 1345.02, actions alleging unfair and deceptive consumer sales practices do not require evidence of an intent to deceive. Thomas v. Sun Furniture and Appliance Co. (1978), 61 Ohio App.2d 78. Whereas R.C. 1345.02 prohibits unfair or deceptive acts or practices, R.C. 1345.03 prohibits unconscionable acts or practices in connection with consumer transactions whether such acts or practices occur before, during, or after a transaction. This section lists a number of circumstances to be taken into consideration in determining whether an act or practice is unconscionable. In order to recover for unconscionable acts or practices, the consumer must prove that the supplier acted unconscionably and knowingly. Karst v. Goldberg (1993), 88 Ohio App.3d 413. In the case sub judice, the trial court denied appellants' claim alleging a violation of the Ohio Consumer Sales Practices Act, finding that "[t]his was a construction contract which went awry, but it was not of a character which the court can in any way describe defendant's practices as deceptive, unconscionable or unfair." We find that the court's decision was not against the manifest weight of the evidence. As the trial court correctly noted in its judgment entry, once appellee commenced construction, the project was substantially completed within approximately nine months. Appellee further testified, at trial, that despite the delay in commencement, he believed that he could complete the house on time. Appellants maintain that appellee violated the Consumer Sales Practices Act by informing them he would not have the house finished by their tax deadline, but informing the bank that he would. Appellee testified, at trial, that he believed the ninety working days in which he had to complete the contract began to run on November 26, 1995, "the first day we . . . started to dig the basement." Tr. at 256. Appellee's testimony also seemed to indicate that appellee told State Savings manager, Mike Myers, that as of November 26, 1995, appellee thought he could make the mid-April deadline:
 Q. Did you believe, at that time, did you believe that you could get it done in 90 days?
 A. I thought it would be enough, he was told that when we — in fact Mike and I talked about April.
However, appellee also testified that he told Mike Myers that appellee "didn't think 90 days was doable." Id. Upon further questioning, appellee admitted that he did not tell the appellants that he did not think the ninety days was feasible. However, appellee also testified that he believed that "[i]f everything went right . . ." appellee could get appellants in the house by the middle of April, 1996. Id. at 256, 257. Prior to March 1996, it became clear to appellee that he could not make the mid-April deadline:
Q. When was the foundation ready for you to start work?
 A. In March, the exact date, I don't know. And Mike and I discussed the day he come to inspect the foundation, that there was no way we could get the extension, just to do the best you can do, and that's what I did.
 Q. And you didn't communicate that with the Keetons at that time either?
A. No.
Q. Did you tell Mr. Myers to communicate that to the Keetons?
 A. No, I did not, because the 90 working days, we hadn't began to use the 90 working days, when you take the bad weather out in January, December, February.
Id. at 266.
The Court, in its judgment entry, noted that "there is no contract definition as to what constitutes working day" and that the initial delay was chargeable to appellants "as they were owners of land with a title defect." While appellee's lack of candor may have been regrettable, we do not find that the trial court's refusal to find that appellee's actions constituted a violation of the Consumer Sales Practices Act was against the manifest weight of the evidence. Such decision was supported by competent, credible evidence. As appellants note, a violation of R.C.1345.02(A) can be based on a finding that the contractor performed his work in an unworkmanlike manner. However, while the workmanship in this case was less than satisfactory, we do not find that it was so poor as to be unconscionable. Dr. Vedaie, appellants' expert, stated in his report that during his investigation he discovered "a number of basic structural problems which initiated from poor and inadequate design and planning, and a lack of the knowledge and experience needed to build a building", "as well as signs of poor workmanship throughout the building." However, Don Davis, appellants' other expert, described the quality of workmanship on appellants' home as "average overall". Id. at 174. In addition, appellee's expert, Ronald C. Keyser, testified that appellants "got a good value for their dollar" and that, for the most part, the problems with the house were "minor in nature." Id. at 87, 109. Keyser further testified that he "didn't see a sacrifice in quality for quantity of square footage for the price." Id. at 109. There was, therefore, evidence from one of appellants' own experts, in addition to testimony from appellee's expert, that the quality of construction was "average". Thus, we find that the trial court did not err in declining to find a violation of the Consumer Sales Practices Act based on poor workmanship. Since there was competent, credible evidence supporting the trial court's decision, such decision was not against the manifest weight of the evidence. Although appellee's intentional filing of a false affidavit of contractor, to secure a draw against the construction loan, may constitute criminal conduct, we find that the trial court did not err in refusing to find the same constitutes a violation of the Consumer Sales Practices Act. Appellants specifically argued a violation of R.C.1345.03(B)(6) because appellee filed false affidavits, during the project, which resulted in the filing of mechanic's liens. R.C.1345.03(B)(6) provides that one of the circumstances to be considered in determining whether a consumer act or practice is unconscionable is "[w]hether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to his detriment." There is no evidence that appellants relied on the false statements contained in the affidavits. Nor were the false affidavits "misleading statement[s] of opinion." Since there is competent, credible evidence supporting the trial court's finding that appellee's performance was not a deceptive, unfair or unconscionable act, appellants' First Assignment of Error is overruled.
 II
Appellants, in their Second Assignment of Error, maintain that the trial court's failure to award appellants approximately $12,000 in damages, due to appellee's delay in completing the house, was against the manifest weight of the evidence. We disagree. As stated above, the contract between the parties, which was executed on August 21, 1995, provided that the house would be completed "in 90 working days." Although appellants informed appellee that they had to occupy the house by mid-April 1996, to avoid serious tax consequences, appellants could not move into the house until July 23, 1996. Appellants specifically sought to recover their additional capital gains tax, which totaled $5,491.05, the additional rental expenses for their housing and that of their livestock, as well as for the extension penalty paid to the bank, which together totaled over $6,000. Although the contract in this matter was executed on August 21, 1995, appellee could not immediately commence construction since a title examiner discovered an unreleased Ashland Oil pipeline easement which needed to be released before construction could commence. Since the easement problem was not resolved until mid-November 1996, appellee lost approximately three months of valuable construction time. Appellee testified, at trial, that he was unable to complete the project by mid-April 1996 due to adverse weather conditions. Appellee specifically argued that because of the rainy and wet weather conditions, he was unable to get the cement work done for the foundation in a timely manner. Appellee, however, never requested any extensions of time to complete the house. While there is nothing in the parties' contract that excuses appellee from timely performance due to weather conditions, we find the trial court's failure to award appellants damages for appellee's delay was not against the manifest weight of the evidence. As the trial court noted in its judgment entry: ". . . the initial delay of contract, though not the `fault' of either party, is chargeable to the plaintiffs [appellants] as they were owners of the land with the title defect. Would Hinkle [appellee] have agreed to a 90 working day construction period had he known he couldn't start until late November, instead of August? We don't know! It would appear that for an April, 1996, completion to work after a later November, 1995, start, everything would have had to work perfectly with respect to weather, and even then 90 working days would have been very close to April at best."
In short, appellee lost approximately three months, August 21, 1995, to approximately November 22, 1995, of productive construction time due to the problems associated with the Ashland easement. When appellee was finally able to commence construction, winter weather conditions had set in, making it extremely difficult for him to lay the foundation. Furthermore, as the trial court pointed out in its judgment entry, the term "working days" was never defined in the parties' contract. Based on such factors, we find that the trial court's refusal to award appellants damages for delay was not against the manifest weight of the evidence. We find that there was competent, credible evidence supporting the trial court's decision. Appellants' Second Assignment of Error is overruled.
 III
Appellants contend, in their Third Assignment of Error, that the trial court erred when it awarded only $11,465 in damages when the evidence was uncontroverted as to a greater amount. Appellants also argue the minimum amount of compensatory damages the trial court could have awarded was $17,186.07 plus $2,000 for engineering services. We disagree. In support of this assignment of error, appellants refer to the report of their expert witness, Don Davis. According to Mr. Davis, the total dollar amount of the needed repairs, to appellants' house, is $31,676.07. Appellee offered no alternative damage figure but instead claimed that most of the problems with the house were the result of appellants' failure to final grade the ground around the house. Appellants argue that when the trial court refused to accept appellee's "final grade" argument, it had no option but to find in favor of appellants on each of the claimed construction errors and to award damages as to each. "We will not disturb a decision of the trial court as to a determination of damages absent an abuse of discretion." Roberts v. U.S. Fid. Guar. Co. (1996), 75 Ohio St.3d 630,634, citing Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore at 219. In determining damages, in addition to reviewing the report submitted by appellants' expert, the trial court also had to assess the credibility of the expert witness. It is possible, in awarding an amount of compensatory damages less than requested by appellants, that the trial court found appellants' claimed damages to be speculative and not supported by the evidence. As an appellate court, "[o]ur role in assessing credibility is very limited because we do not have the same opportunity that the trier of fact has in being able to see the witnesses testify and their demeanor while they testified. Instead, we have only the printed words of the record." Gould v. Pinnacle Properties, Inc. (June 26, 1998), Warren App. No. CA97-11-120, unreported, at 3. We do not find any evidence, in the record, that would indicate the trial court abused its discretion in awarding compensatory damages. The mere fact that appellee did not present evidence, other than the "final grade" argument, does not mean that appellants are automatically entitled the amount of requested damages. In determining the amount of damages to award, the trial court, in addition to reviewing the evidence concerning damages, must also consider the credibility of the witness who presents the evidence. We do not find the trial court abused its discretion when it awarded compensatory damages in the amount of $11,465. Appellants' Third Assignment of Error is overruled.
 IV
Appellants, in their Fourth Assignment of Error, argue that the trial court's failure to award damages for the underpinning of the footer was against the manifest weight of the evidence. We disagree. The trial court, in its judgment entry, made the following statement regarding the underpinning: The Court is unable to award the suggested award of $14,490 for "underpinning" the footer for basement foundation walls. There is speculation that such may be necessary. However, it is noted that neither of the engineering reports examining this issue (Dr. Vedaie and Crane Engineering) excavated to the footer to confirm the need for underpinning and could only speculate as to such issue.
Appellants sought a total of $14,490 in damages for underpinning of the footer for the basement foundation walls. Don Davis, in his report, estimated the cost of underpinning at $14,490. Davis also stated that "[a]n engineering report will better identify the actual structural integrity of the ground (base), footings, foundation walls, floor . . ." The trial court denied appellants' request for $14,490 in damages. We do not find that the trial court erred in declining to award $14,490 in damages for underpinning since there was competent, credible evidence supporting the trial court's decision. Crane Engineering Consultants, in a report prepared for appellants, provides, in pertinent part, with respect to the foundation: If step and vertical cracking patterns persist after moisture has been eliminated, stabilization of the foundation footing is normally needed. This can be achieved by underpinning or rebuilding the footing. This can be an extensive and expensive repair. Many times, further investigation is needed (i.e. soil samples taken, and possible excavation along the building to examine the condition of the footing.)
At minimum, the foundation walls require point and tuck work, elimination of the moisture that may contribute to the situation, and monitoring the walls for any additional movement. In some cases, in lieu of monitoring the situation, further investigation may be undertaken at this time since many times the effects of foundation settlement can occur over several years and the remedies can be very expensive.
The clear implication from the language in the Crane Engineering report is that underpinning may be needed in the future depending on whether cracking persists after moisture is eliminated. Since, based on such report, there was competent, credible evidence from appellants' own expert supporting the trial court's decision that such damage was "speculative", we find the trial court's decision in refusing to award damages for the underpinning was not against the manifest weight of the evidence. Appellants Fourth Assignment of Error is overruled.
 V
Appellants, in their Fifth Assignment of Error, allege that the trial court's award of damages in the amount of $1,679.35, to appellee, on his counterclaim for extras, was an abuse of discretion and against the manifest weight of the evidence. We agree. The contract between appellants and appellee provided appellants with a $3,500 "cabinet and vanity allowance." The contract further stated as follows: Extras or Credits "Any deviation from these specifications or plans involving an extra charge or credit must be agreed upon in writing between the contracting parties before the change is made." (Emphasis added.)
Appellants selected cabinets on appellee's credit costing $5,179.35, or $1,679.35 more than the $3,500.00 allotted in the contract. Appellee testified as follows when asked whether Appellant Linda Keeton knew the cost of the cabinets when she met with the Amish cabinet maker and appellee:
A. No, she knew there was a $3,500 allowance.
Q. She never knew what they cost?
A. She ordered them, I don't know.
Q. You never gave her an opportunity to —
A. No.
Q. — make changes?
A. Not —
 Q. You took total responsibility for the cost of cabinets; do you remember that?
A. No, I don't.
Tr. at 312. Appellants agreed that the $1,679.35 excess for the cabinets was an "extra" that was not authorized in writing as required by the contract. However, the trial court, in holding that the $1,679.35 excess was not an "extra" and that appellee was entitled to a judgment against appellants in such amount, specifically stated in its judgment entry as follows: "Plaintiffs [appellants] made the selection and was [sic] aware of the contract allowance, and (in the court's view) had an obligation to inquire as to the price of items selected. They should not be rewarded by this failure to inquire to the extent of such excess selection of material." We find that the trial court erred in granting judgment to appellee in the amount of $1,679.35 on his claim for an extra in connection with the cabinets and vanities. The contract between the parties expressly provided that "[a]ny deviation from these specifications or plans involving an extra charge . . . must be agreed upon in writing." There is no evidence that there was such a writing between the parties. Appellee, therefore, is not entitled to recover for the "extras" that he provided in connection with the cabinets and vanities. See Sites v. Moore (1992), 79 Ohio App.3d 694; Frantz v. Van Gunten (1987),36 Ohio App.3d 96. Nor is there evidence that the provision in the parties' contract, requiring deviations involving an extra charge to be in writing, was waived by the parties since there is no evidence that the deviation was made with the knowledge and participation of all concerned. Appellee himself was unable to state whether Appellant Linda Keeton knew the cost of the cabinets she selected when she met with appellant and an Amish cabinet maker. Appellants' Fifth Assignment of Error is sustained.
 VI
Appellants, in their final assignment of error, contend that the trial court erred in ordering that Baldauf Lumber, appellee's materialman, be paid in full out of the loan proceeds remaining on deposit with State Savings. We agree. Baldauf Lumber filed a claim for foreclosure of the mechanic's lien which it had filed against appellants' property. At the commencement of the trial, the trial court stated that "[a]t the last pretrial it was agreed to bifurcate certain issues including the claims and issues relating to the (sic) Baldauf Lumber resulting from a mechanics (sic) lien they filed against the property." Tr. at 5. However, the trial court, in its judgment entry, awarded judgment to appellants "in an amount necessary to secure release of the Baldauf mechanics (sic) lien, which payment shall be secured from the construction funds held by the bank and for which amount plaintiff [appellants] shall receive a credit against the remaining contract amount due defendant [appellee]." Since the trial court's order was contrary to the parties' stipulation and, as appellants allege, denied appellants the opportunity to establish defenses to the payment of the Baldauf lien, we find that the trial court erred as a matter of law in awarding Baldauf all of its claim without giving the parties an opportunity to defend against the same. Appellants' Sixth Assignment of Error is sustained.
Based on the foregoing opinion, appellants' First, Second, Third and Fourth Assignments of Error are overruled. Appellants' Fifth and Sixth Assignments of Error are sustained. This matter is remanded to the trial court for further proceedings consistent with this opinion.
HOFFMAN, J., CONCURS IN PART AND DISSENTS IN PART.
EDWARDS, J. DISSENTS.